*SEA 84492 Summons ISS/*

Brett McDonald
6010 118th Ave SE
Bellevue, WA
98006
310.775.7997

_____ FILED   _____ ENTERED
_____ LODGED   _____ RECEIVED

SG   MAY 0 9 2017

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY   WESTERN DISTRICT OF WASHINGTON
DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

**17** Case No.: **CV-00724** JCC

| | |
|---|---|
| BRETT MCDONALD, an individual, | ) |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT FOR MONEY DAMAGES; BREACH OF CONTRACT; PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT** |
| BORA GURSON, an individual and | ) |
| ROXYCAR INC., a Delaware | ) |
| corporation, | ) |
| Defendants. | ) |

Brett McDonald, the plaintiff, hereby alleges the following:

### NATURE OF THE ACTION

1.      This is an action for breach of contract and related claims arising out of oral and written agreements pursuant to which Plaintiff provided operational, financial and other services to Defendants.

2.      Defendant Bora Gurson ("Gurson") refused to recognize the valuable services performed under the contract and instead asked Plaintiff to reduce his agreed 10% equity interest in RoxyCar Inc. (the "company"). Gurson then breached his agreement with Plaintiff. After that, he threatened, harassed and sued Plaintiff and his family in an attempt to force a "low-ball" settlement.

3.      Plaintiff seeks as relief $1,400,000 in damages, plus costs of suit.

## I.    THE PARTIES

4.    Plaintiff Brett McDonald ("McDonald") attended UCLA School of Law, worked at a large law firm, and has served as the Chief Executive Officer for two technology startups. He has also worked with new businesses in development and obtaining financing. He is married, and lives with his wife and 4 children in the Seattle area.

5.    Bora Burson ("Gurson") is a businessman living in Honolulu Hawaii. He is the CEO and primary shareholder of RoxyCar Inc.

6.    RoxyCar Inc. (the "company") is a Delaware corporation doing business throughout the United States with principal offices located in Hawaii.

## II.    JURISDICTION AND VENUE

7.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because the plaintiff is a resident of a different state from the defendants and because the value of the matter in controversy exceeds $75,000.

8.    Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claim is based occurred in the Western District of Washington.

9.    Venue in this district is also proper pursuant to 28 U.S.C. § 1391(b)(3) because Gurson has consented to personal jurisdiction by suing McDonald in this district in the Superior Court of Washington, in and for King County, styled *Bora Gurson v. Brett McDonald and Jane Doe McDonald*, Cause No. 17-2-07709-7 SEA. This action has been removed to this court under 28 U.S.C. § 1367.

## III.    FACTS

10.    **1st Meeting and Agreement – January 18, 2017.**

1    11.    McDonald first met Gurson on January 18, 2017 in Honolulu Hawaii.

2  The meeting was organized by Blue Startups a Hawaii-based technology investor

3  and incubator.

4    12.    When asked, McDonald provides consulting services to technology

5  companies funded by Blue Startups. Gurson's company, RoxyCar, was one of

6  those companies. A copy of the emails between McDonald and a representative

7  from Blue Startups setting up the meeting between McDonald and Gurson is

8  attached as Exhibit A.

9    13.    Gurson saw that McDonald has had reasonable success, in particular

10  as CEO of Vantage Sports, Inc. This included raising more than $3 million to fund

11  the company, successfully setting up overseas operations and continuing to this

12  day as its CEO.

13    14.    Gurson wanted to buy and sell used cars. Gurson had employed a

14  software engineer to automate this process and organized as a corporation.

15    15.    Gurson explained his business in broad terms and described what he

16  needed to do in order to make the business successful. The company required help

17  in financing, finding and pitching investors, operations, further software

18  development and financial modeling. McDonald has a background in all of these

19  areas and was intrigued by the business opportunity.

20    16.    Gurson and McDonald started to discuss a role in the company for

21  McDonald and Gurson presented McDonald with a Confidentiality Agreement and

22  McDonald signed. A copy of the Confidentiality Agreement is attached as Exhibit

23  B.

24    17.    McDonald extended his stay in Honolulu for an extra day and on

25  Saturday, January 21, 2017, Gurson and McDonald agreed that in exchange for

10% of the company, McDonald would handle operations, help with financing and other matters.

18. **McDonald Performs – January 22 - March 4, 2017.**

19. McDonald immediately got to work as an executive of the company. This performance included the following:

    a) Setting up company email and communications (and begins use of his company email account (brett@roxycar.com);

    b) Advising as to potential business structure for an investment fund;

    c) Getting in touch with potential investors;

    d) Meeting with banks including Silicon Valley Bank about potential funding;

    e) Devising the company's first projected financial model;

    f) Flying to San Francisco on McDonald's own expense to attend investor meetings with Javelin Venture Partners, Cordillero Partners and more;

    g) Planning operations and negotiating with potential 3rd party vendors;

    h) Recruiting technical talent and negotiating with potential employees;

    i) Planning short and long-term technical development;

    j) Setting a meeting with McDonald's personal and valuable contacts at CoPart Inc.;

    k) Introducing Gurson to McDonald's personal and valuable legal contacts at Orrick Herrington and Sutcliffe who Gurson interviewed and hired as company counsel;

l)   Negotiating the company's term sheet with Javelin Venture
     Partners;

m)  Saving Gurson personally 12% dilution on the term sheet via the
     Option Pool.

20.     **McDonald Begins Helping Fundraise – January 22, 2017.**

21.     Immediately upon coming to an agreement, McDonald got to work as promised. Acting as an executive of the company, McDonald reached out to his contact at Silicon Valley Bank whom he had worked with on previous companies.

22.     McDonald has a relationship with Geir Hansen, Managing Director of Emerging Technologies and met over lunch to discuss financing for RoxyCar. A copy of McDonald's email to Hansen is attached as Exhibit C.

23.     **McDonald is Issued A Company Email Address – January 30, 2017.**

24.     Acting in his capacity as Chief Operations Officer, McDonald setup company email addresses and a internal messaging service and started communicating via brett@roxycar.com. A copy of an email from McDonald's company email is attached as Exhibit D. Additional emails from this address appear in subsequent email exhibits.

25.     **McDonald and Gurson Strategize About Investor Pitches – February 2, 2017.**

26.     On February 2, 2017, Gurson asks McDonald about a potential investor stating: "Seems like Shayna from the xg fund is invested in another car company which is about to go out of business.. What can we do in a situation like this to make sure she is not fishing for info?" A copy of the email is attached as Exhibit E.

27.    **McDonald Flies to San Francisco To Attend Investor Meetings –
February 7, 2017.**

28.    On February 7, 2017, McDonald flew to San Francisco to attend
investor meetings as part of the executive team of RoxyCar. Emails setting up,
confirming and following up on these meetings are attached as Exhibit F and
Exhibit G.

29.    McDonald directly and closely involved in pitching and following up
with investors. In these meetings he acted on behalf of the company.

30.    An example of an email to a prospective investor where McDonald
outlines what the company will do for the "next steps" in the investment decision
is attached as Exhibit H.

31.    **McDonald Plans Offshore Operations – February 13, 2017.**

32.    After drawing up specifications for technical and manual operations,
McDonald began interviewing and negotiating with potential offshore vendors. A
copy of an email introducing McDonald to one such vendor is attached as Exhibit
I.

33.    **Gurson Threatens Breach, But Re-Commits to Agreement –
February 13, 2017.**

34.    On February 13, 2017, Gurson called McDonald and said he was
having second thoughts about the agreement. He stated for the first time that he
now wanted the agreement to require some part of the 10% to be contingent upon
McDonald helping to secure investment or partnership with a company called
CoPart. McDonald had a pre-existing relationship with executives at CoPart and
had arranged a meeting.

35.     McDonald objected, stating that (1) they had already agreed, (2) his services were worth the agreed 10% regardless of any potential deal with CoPart and (3) it was not in the company's best interest to have McDonald solely focused on getting money from one potential investor.

36.     Gurson agreed, stating, "okay, we'll stick with the 10%." They then continued planning and strategizing for the future.

37.     **Gurson Hires Philip Maymin As Chief Analytics Officer – February 16, 2017.**

38.     Again, McDonald provided Gurson with a valuable connection when he introduced him to Dr. Philip Maymin. Dr. Maymin is one of the most qualified statistical experts in the world, holding degrees from Harvard and a Ph.D. from the University of Chicago. McDonald helped negotiate the terms of Maymin's hiring for 5% of the company.

39.     After reaching an agreement with Dr. Maymin, Gurson emailed: "Deal!!! And it looks like our friend  Gus is gonna be on board too.. I'm excited to work with both of you!!"

40.     "Gus" is a reference to a potential investor. A copy of the emails where 5% is agreed to for Dr. Maymin is attached as Exhibit J.

41.     **Gurson Announces the Complete RoxyCar Executive Team – February 16, 2017.**

42.     After Gurson hired Dr. Maymin as Chief Analytics Officer, he personally announced that the full executive team was complete. The email from Gurson to McDonald, Maymin and Kaan (the company's software engineer) is titled: "Roxycar Executive team" and Gurson writes:

1    "Hello Gents, I'm excited to announce that we have formed the Roxy

2    Car Executive team which will execute this arbitrage opportunity as well as

3    create amazing analytic/ technologies for the auto industry. Let's all give it

4    all we have so that we can sell sell this company to the highest bidder in the

5    near future! I strongly feel that this team has everything it takes to make it

6    happen. Let's all have a stand-up meeting so we can all talk and set the path

7    for the coming weeks. How does  11:30am HST tomorrow work for

8    everyone? Kaan(aka the man behind the curtain of Roxy) will join us too."

9    A copy of this email is attached as Exhibit K.

10    43.    McDonald, acting in his capacity as COO, provided Dr. Maymin with

11    his company email address.

12    44.    **McDonald Introduces Gurson to His Trusted Company Counsel.**

13    45.    McDonald again used his experience and connections to introduce

14    Gurson to Andrew Erskine (Erskine) a partner at Orrick, Herrington & Sutcliffe

15    LLP. McDonald attended UCLA School of Law with Erskine and had worked with

16    him in the past and knew him to be an excellent lawyer for startup companies such

17    as RoxyCar. Gurson interviewed Erskine and hired him and his law firm as

18    company counsel. A copy of the email introducing Gurson to Erskine is attached as

19    Exhibit L.

20    46.    **McDonald Negotiates Offshore Operations – February 20, 2017.**

21    47.    McDonald had multiple phone calls with prospective vendors, made

22    financial plans and training guides. An email showing negotiations with a potential

23    vendor is attached as Exhibit M.

24

25

48.     **McDonald Negotiates the Business Terms of the Term Sheet with Javelin Venture Partners and Saves Mr. Gurson 12% Personal Dilution – February 17-28.**

49.     By February 17, 2017 the company had received a term sheet from Javelin Venture Partners.

50.     A term sheet is a preliminary step to take due diligence and potentially proceed with an investment. Due diligence is always required, including whether there is a fundamental change in the status of the founding team, i.e. they stop working together.

51.     McDonald provided a markup of the crucial business terms of the Term Sheet to improve the company's and Gurson's personal deal. A copy of the email attaching the markup is attached as Exhibit N.

52.     Specifically, McDonald negotiated the "employee option pool" for future hires from 15% suggested by Javelin to 3%. This *solely benefited* Gurson as McDonald and Javelin's stock was going to be granted at the same time.

53.     The reason McDonald could negotiate a 15% option pool down to 3% was because with McDonald handling operations and financial modeling for his 10%, the company did not need to make any more Executive hires.

54.     After initial negotiations, McDonald continued to act on behalf of the company to finalize and sign the term sheet.

55.     On February 22, 2017, McDonald writes to Javelin company counsel and states, "We look forward to signing and closely quickly." A copy of this email is attached as Exhibit O.

56.     Mr. Gharakhanian, Javelin's counsel, interacts with McDonald as an executive of the company in his reply.

57.    Following on-the-phone negotiations, McDonald emails the group with last revisions where again he "dropped the option pool back down with the understanding that founding team will be issued stock in NewCo and thus will not require options." A copy of this email is attached as Exhibit O.

58.    McDonald pressed this point, saving 12% dilution purely to benefit Gurson and of course with the expectation that his agreement for 10% would be honored.

59.    McDonald then gathered the required signatures for the finalized term sheet on February 28, 2017.

60.    **Employment Agreement Includes McDonald's 10%.**

61.    Having been proceeding under the contract that was discussed and agreed, McDonald sent Gurson a copy of an employment agreement including the 10% stock grant on February 21, 2017, to which Gurson replied, "They look good. Andrew will send his versions too.. I'm assuming they will be similar if not identical."

62.    Andrew is Erskine and McDonald agrees that company counsel should draft the legal components of the employment agreement. A copy of the email is attached as Exhibit P.

63.    **Gurson Makes Sure He Understands the Term Sheet In Relation to McDonald's 10% – February 22, 2017.**

64.    The Term Sheet from Javelin had a section dealing with Founders Stock Vesting. McDonald was helping Gurson to negotiate more up-front vesting for his stock to benefit Gurson.

65.    Gurson was concerned that this favorable vesting might apply to McDonald's 10% as well and emailed: "I was reading though the TS. I just want it

make sure we are both in the same page about the vesting. It will be the standard and typical vesting for your portion of equity with the 1 year cliff."

66.    McDonald replied: ""Yes, that is our deal. We are negotiating your vesting on the TS. Notice that is states that it will be "vary by employee."" A copy of this email is attached as Exhibit Q.

67.    **McDonald and Gurson fill out the "Corporate Questionnaire" Granting McDonald 10% of the Corporation – February 24, 2017.**

68.    Corporate counsel had advised that it was best to organize a new company rather than use the corporation Gurson had previously established.

69.    To that end, Erskine and his team at Orrick emailed Gurson and McDonald a "Corporation Questionnaire" to get information on all Founder Stock grants, company directors/officers and other corporate formation.

70.    This Questionnaire was to be used by corporate counsel to get all corporate documents in place.

71.    McDonald and Gurson filled out the Questionnaire together while on the phone with Gurson naming stock grants, directors, etc. and McDonald emailed the completed Questionnaire to the Orrick team, copying Gurson on the email.

72.    The Questionnaire included the agreed upon equity grant for McDonald of 10%. Gurson was to receive between 63% and 69% depending on how much of the remaining portion of the round was raised from investors besides Javelin.

73.    As stated on the Questionnaire and in McDonald's email to corporate counsel, McDonald's grant was "fixed" at 10%. Gurson in no way disputed this completed Corporate Questionnaire and personally directed its completion.

74.    A copy of the Corporate Questionnaire as completed by Gurson and McDonald is attached as Exhibit R. A copy of the email to the corporate team and copying Gurson is attached as Exhibit S.

75.    **Gurson Again Threatens to Breach His Agreement with McDonald – February 25, 2017.**

76.    On February 25, 2017 after the Term Sheet had been finalized and signed and Questionnaire filled out, Gurson emailed McDonald in relevant part: "Now since things have changed I think that the 10 percent equity does not properly represent our initial agreement," and stated that in his view it was "fair" that McDonald, "receive 5% and an additional 2.5% if we make any sort of long term deal with Copart and an additional 2.5% if Copart invests $750k or more and opens up a $5M credit line for Roxy." A copy of this email is attached as Exhibit T.

77.    McDonald and Gurson had an approximately one hour-long phone call where McDonald reminded Gurson of their agreement, and all his actions for the benefit of the company and Gurson personally. McDonald asked him not to break their agreement. Gurson said he would think about it.

78.    **McDonald Asks If Gurson Will Honor Their Agreement – February 26.**

79.    On February 26, McDonald asked if Gurson was going to persist in his threatened breach. He asked via the company's chat application "Slack", which McDonald had previously set up for the company:

"What did you decide about our relationship?"

Gurson replied: "I don't want to break up, Have you thought about it?"

McDonald replied: "Well I haven't changed"

1    Gurson replied: "I'm having a hard time. I need more time. You sure you
2  are gonna be handle the operations?"

3    McDonald replied: "Yes"

4    Gurson replied: "Let's talk in the morning please. I'll call you when I wake
5  up."

6    McDonald replied: Okay! A copy of this conversation is attached as Exhibit
7  U.

8    80.    The next day, during a long conversation, McDonald also notified
9  Gurson that if he persisted in refusing to honor their agreement, McDonald would
10  need to notify Javelin of that fact.

11    81.    McDonald reminded Gurson that the company had received a due
12  diligence request list which included required disclosure of any employment
13  issues, issues that might give rise to litigation or any issues with company stock
14  ownership. Gurson said that he was not going to honor the agreement.

15    82.    **Hoping For A Resolution and In Accordance with Javelin's Due**
16  **Diligence Request, McDonald Notifies Javelin Venture Partners of the**
17  **Problem.**

18    83.    McDonald was still hopeful that Gurson would not breach. He thought
19  that Javelin could convince Gurson that doing so was immoral, bad business and
20  contrary to law.

21    84.    Furthermore, the company had received a due diligence request list
22  from Javelin that required disclosure of just this type of issue.

23    85.    McDonald was still an officer/employee of the company and was
24  obligated to disclose the issue to Javelin.

25    86.    **One More Try – March 4, 2017.**

1    87.    On Saturday, March 4, McDonald emailed Gurson, again requesting

2  that his contract be honored.

3    88.    Shortly after sending the email, McDonald was notified by Google

4  Security that his email account (brett@roxycar.com) was signed into via a Mac in

5  Honolulu, Hawaii. A copy of these notifications is attached as Exhibit V.

6    89.    McDonald was also notified that his account password had been

7  changed. Gurson was the only other person besides McDonald that had

8  administrative privileges over company email. Gurson was in Honolulu Hawaii at

9  the time.

10    90.    Gurson gave no notice of this access, did not request access and gave

11  no reason for shutting McDonald out of his email account. Fortunately McDonald

12  had backed up his email account prior to this invasion of privacy.

13    91.    **The Threats Commence – March 20, 2017.**

14    92.    Gurson then hired two lawyers, Tod Ratfield of Walnut Creek, and

15  David Fuad of Orrick Herrington to write to McDonald. Mr. Fuad first wrote on

16  March 20, 2017 at 4:10pm. Mr. Ratfield first wrote on March 20, 2017 at 8:51pm

17  just 4.5 hours after Mr. Fuad.

18    93.    A copy of correspondence from Mr. Fuad is attached as Exhibit W. A

19  copy of correspondence from Mr. Ratfield is attached as Exhibit X (settlement

20  offer removed).

21    94.    Mr. Ratfield threatened to sue McDonald into bankruptcy if he

22  refused to take a bad settlement offer.

23    95.    Attorney Jon Adams from New York ("Adams") contacted Messrs.

24  Ratfield and Fuad, notified them that he was representing McDonald in

25  negotiations, and objected to Gurson and Mr, Ratfield threatening to sue the

1  injured party and his wife and 4 kids into bankruptcy as a tactic to force him into a

2  bad settlement. A copy of this email is attached as Exhibit Y (settlement offer

3  removed).

4      96.    Adams also objected that McDonald helped to hire Orrick to represent

5  RoxyCar, and it now sought to turn on him and may have confidential information

6  and a conflict.

7      97.    Mr. Ratfield started a settlement negotiation but then abruptly

8  departed the case, toning down the threats but still threatening it was "out of his

9  hands," i.e. Gurson would sue the injured party, McDonald, if he didn't take the

10 settlement being offered.

11     98.    McDonald interpreted the "bankruptcy" threat as a threat to go after

12 his entire family.

13     99.    Mr. Fuad confirmed Orrick would not be involved.

14     100.   **What Confidential Information?**

15     101.   Attorney Adams repeatedly asked in correspondence to Messrs.

16 Ratfield and Fuad that they identify any information Gurson believed McDonald

17 had. (See Exhibit Y). No reply was ever received.

18     102.   Adams also represented that McDonald was not aware of any

19 Confidential Information or any information that could harm Gurson's interests in

20 any way. Id. Adams asked repeatedly what they wanted. No reply was received –

21 only "it's out of my hands" and more threatening language. Id.

22     103.   **Ratfield Won't Respond.**

23     104.   At no point does Mr. Ratfield reply with an answer, following

24 repeated requests to identify confidential information that McDonald could have

25 and/or that needs to be returned, deleted or destroyed.

105.   **Fuad Won't Respond.**

106.   At no point does Fuad reply with an answer about any confidential information that McDonald could have and/or that needs to be returned, deleted or destroyed.

107.   **Gurson Won't Respond.**

108.   After Fuad confirmed that Orrick was no longer representing Gurson/RoxyCar in the matter and Ratfield confirmed that the matter was also "out of his hands," and he was no longer counsel, Attorney Adams asked Gurson to identify information Gurson believed McDonald had. A copy of this email is attached as Exhibit Z. No reply was ever received.

109.   **Gurson Makes Good On His Threat to 'Settle or Be Sued,' Sues McDonald, Sues His Wife, and Sends Process Server to Their Home at Night at Kids' Bedtime – April 5, 2017.**

110.   After Messrs. Ratfield and Fuad left abruptly or were conflicted out, Gurson carried out his threat and hired attorney Mike Gossler in Seattle. He sued McDonald and his wife in the Superior Court for King County accusing McDonald of various claims all stemming from the unsupported belief that McDonald had confidential information or would somehow compete with RoxyCar, and adding a claim based on McDonald's reporting that RoxyCar had breached/fired him to his new and established business contacts.

111.   Despite being told that Attorney Adams had been representing McDonald in settlement negotiations, Gurson sent a process server after dark to the McDonald's home on April 5, just as it was bedtime for his 4 kids.

112.   Continuing to make good on his promise to 'take my bad settlement or I'll sue you,' Gurson even somehow convinced Mr. Gossler to sue McDonald's

wife, who had nothing to do with any of this, as well as to seek "marital property" without any investigation or evidence that any property had even been transferred.

113.   **Gossler Won't Respond.**

114.   Attorney Adams wrote to Mr. Gossler the next day, April 6, objecting that McDonald's wife had been sued and a process server sent in the dark at the kids' bedtime.

115.   Adams stated again, "[McDonald] doesn't have any confidential or "evaluation information." A copy of this email is attached as Exhibit AA.

116.   Adams stated a settlement offer, demanded Mrs. McDonald be dropped from the lawsuit, and requested again to know what confidential information McDonald was alleged to have so he could return it, destroy it, or confirm it was destroyed.

117.   McDonald was still bewildered, because he didn't have any confidential information. Plaintiff also requested an electronic copy of the complaint. Gossler did not reply.

118.   On April 8, 2017, Adams again wrote to Mr. Gossler, "Mr. McDonald has never refused to return anything and does not believe he has any "Evaluation Material." We have never received an answer, and are now on the third attorney, still asking..." A copy of this email is attached as Exhibit BB.

119.   Finally, Gossler responded, but did not specify any confidential information that Gurson alleged McDonald had and refused to return.

120.   **A Settlement Is Reached – April 10, 2017.**

121.   On April 10, 2017, Mr. Gossler extended a settlement offer:

"the simple solution to the lawsuit is for him to stipulate to an order that no information provided to him by Mr. Gurson will be disclosed to any third

1    party, that any information he may have will be destroyed, that he will not speak

2    with anyone further about the Roxycar business model, and that he will not use any

3    information provided to him to pursue the Roxycar business."

4         A copy of this email is attached as Exhibit CC.

5         122.   McDonald accepted this offer via Mr. Adams:

6         "Mr. McDonald (and his wife, while still objecting to being named) are

7    pleased to accept the settlement offer you have extended for Mr. Gurson,

8    specifically:

9         1) Mr. McDonald has no confidential information;

10        2) Mr. McDonald will not compete with Mr. Gurson in the RoxyCar

11            business through January 2020;

12        3) No confidential information provided to Mr. McDonald by Mr. Gurson

13            will be disclosed to any third party;

14        4) Mr. McDonald will destroy any confidential information;

15        5) Mr. McDonald will not speak about the Roxycar business model to the

16            extent he has any knowledge of it and such knowledge is confidential

17            information;

18        6) Mr. McDonald will not use any confidential information provided to him

19            to pursue the Roxycar business."

20        A copy of this email is attached as Exhibit DD.

21        123.   **Gurson Breaches the Settlement Agreement – April 17, 2017.**

22        124.   The stipulation and order sent by Mr. Gossler differed in two major

23   respects from the terms offered and agreed to settle the case against McDonald and

24   Mrs. McDonald.

25

125.   First, the stipulation included a release of all McDonald's claims against Gurson for compensation or for any stock ownership.

126.   Second, the stipulation included an open-ended non-compete. This in contravention of all state laws and the original Confidentiality Agreement between the parties.

127.   McDonald objected via Attorney Adams that the proposed stipulation was different than the agreed upon terms of settlement and in response Mr. Gossler responded:

"If Mr. McDonald chooses not to settle on the terms presented in the stipulation and order I provided to you, we have nothing further to discuss at this time."

A copy of the proposed stipulation and dismissal is attached as Exhibit EE.

A copy of Mr. Gossler's email confirming the breach of the settlement agreement is attached as Exhibit FF.

128.   McDonald decided not to seek pro hac vice admission for Attorney Adams, and that it would be easiest and least expensive to proceed pro se.

129.   McDonald is mindful of the threats to "sue him into bankruptcy" and believes this is all a bad faith attempt to bankrupt him and his family by an oddly vindictive Gurson, who McDonald believes breached his agreement, tried to steal McDonald's expertise and business connections, messed up the company's deal, and then went wild.

## ARGUMENT

130.   It appears that Gurson, a used-car- salesman by trade, set off on a scheme to steal business knowledge, expertise, planning, negotiation and valuable contacts from McDonald.

131.   It appears Gurson did not understand that a Term Sheet is preliminary, and after it was signed, he thought the deal was in the bag. Then he proceeded to reneg on the 10% to McDonald that was agreed verbally and confirmed in emails and Company stock documents.

132.   Gurson knew he head cheated McDonald, and so he threatened to sue him if he didn't take a low-ball settlement offer.

133.   After Javelin refused to fund, Gurson became angry with McDonald despite the fact that McDonald always acted in the best interest of the company, helped Gurson personally and it was Gurson's breach that caused the failure of the deal.

134.   Plaintiff performed from the start of the relationship on January 22, 2017, through March 4, 2017 when Gurson breached.

135.   Plaintiff invested significant time, resources and personal reputation performing his duties.

136.   Gurson took the value of Plaintiff's services, and then reneged on the deal. First, he tried to whittle it down to 5% on February 25, 2017, and then he used his password to take over the company email of McDonald and effectively fire him.

137.   Gurson referred to Plaintiff McDonald as a team member in Exhibit G on February 2, 2017 and issued him a company email. Under Gursen's request, McDonald represents the company to investors and other third parties using his company email by February 7 (see Exhibits F, G, H, I and M).

138.   A meeting of the minds is clear. Neither McDonald nor Gurson would allow McDonald to exercise authority for the company in pitches, negotiations and planning if they had not reached an agreement.

1    139.   By February 16, Gurson has agreed to hire Dr. Maymin and writes to

2    McDonald and Dr. Maymin, "I'm excited to work with both of you!!" (Exhibit J).

3    Gurson then announces the completed RoxyCar Executive team in emailing

4    McDonald and Dr. Maymin (see Exhibit K). And he stated, "let's all give it all we

5    have."

6    140.   Again, a meeting of the minds is clear. Why would Gurson announce

7    McDonald as part of the fully formed executive team that he "strongly" feels "has

8    "everything it takes to make it happen" (Exhibit K) if they did not have an

9    agreement?

10   141.   McDonald's Employment Agreement included the agreed upon 10%

11   to which Mr. Gurson replied "looks good." (Exhibit P).

12   142.   If Gurson believed that no contract had been entered, or that the

13   contract was different than 10% of the post-series seed investment, he would have

14   protested the 10% reflected in that short, 1 page agreement. He did not.

15   143.   In Exhibit Q, Gurson makes sure that McDonald's vesting schedule is

16   not as favorable as his, but does not question the 10% grant.

17   144.   Finally, the Corporate Questionnaire (Exhibit R) which was filled out

18   together and sent to Mr. Gurson along with corporate counsel (Exhibit S) again

19   stated McDonald's stock grant of 10%.

20   145.   This was to be *the* documentation used to form the company and issue

21   stock. Therefore, Gurson surely would not have allowed 10% to be listed for

22   McDonald if he had not entered a contract. Instead he directed the completion and

23   did not object after it was sent to corporate counsel.

24

25

146. Even Gurson's email notifying McDonald of the pending breach shows Gurson's mindset. He writes, "Now since things have changed I think that the 10 percent equity does not properly represent our initial agreement" (Exhibit T).

147. Except, nothing had changed. Everything was the same. All that changed was Gurson thought the deal was "in the bag" and so he started trying to hedge on the terms.

148. The only "things" that have "changed" were McDonald had helped to pitch and negotiate a term sheet saving Gurson 12% dilution. The fact that Gurson references "the 10%" is evidence that a meeting of the minds had occurred on the 10%.

149. McDonald undertook significant risk to himself and his wife and 4 children by trusting Gurson and agreeing to bring all of his business and financial connections to the table. Now all that time is wasted, and the parties are in litigation because Gurson failed to threaten McDonald into a bad settlement, and made good on his threat to sue McDonald and his family into bankruptcy.

150. Gurson then offered terms of settlement that were accepted and then changed those terms to include a release of McDonald's claims and a infinite non-compete.

151. It is clear that the sole purpose of Gurson's action is to bully McDonald into a bad settlement and gain an infinite non-compete in contravention of state law.

152. Plaintiff seeks redress for the breach of contract, promissory estoppel, and unjust enrichment.

153.  Plaintiff also seeks a dismissal of Gurson's action in accordance with the agreed upon settlement. Gurson's action has been removed to this court under supplemental jurisdiction.

### IV.  FIRST CAUSE OF ACTION: BREACH OF CONTRACT

154.  There was a valid contract between Plaintiff and Gurson for 10% of RoxyCar.

155.  Gurson breached that contract when he fired Plaintiff without cause and terminated the agreement (for no reason).

156.  Gurson's breach caused Plaintiff to lose his 10% interest in RoxyCar.

157.  According to Gurson, prior to any investment, RoxyCar is valued at $14 million.

158.  Plaintiff is damaged by Gurson's breach in the amount of $1.4 million.

### V.  SECOND CAUSE OF ACTION: PROMISSORY ESTOPPEL

159.  Gurson made a promise to McDonald that he would grant him 10% of RoxyCar in exchange for McDonald's services to the company.

160.  It was reasonable for McDonald to rely on that promise because Gurson acted in accordance with his promise, gave him no reason to question his honesty, and provided him with all that is expected for a corporate officer to have, including a company email and authority to negotiate with third parties and announced publicly multiple times that McDonald was a team member, an executive team member no less.

161.  McDonald relied on the promise and spent considerable time, resources, expertise and credibility on the company.

1    162.   McDonald's reliance caused him to pass up multiple other promising

2    opportunities.

3    163.   Gurson's breach was detrimental to McDonald's reputation in the

4    startup and technology community.

5    164.    Injustice can only be prevented by enforcing Gurson's promise to give

6    McDonald value representing 10% of RoxyCar.

7    **VI.    THIRD CAUSE OF ACTION: UNJUST ENRICHMENT**

8    165.   If for any reason, the court does not find the existence of a valid

9    contract between Plaintiff and Gurson, Gurson was unjustly enriched by

10   McDonald's services.

11   166.   Many benefits were conferred upon Gurson by McDonald's services

12   including (a) detailed plans for operations and technical enhancements to the

13   existing platform (b) valuable business connections (c) valuable expertise in

14   pitching potential investors and (d) valuable expertise in how to negotiate a term

15   sheet.

16   167.   It would be inequitable for Gurson to retain those benefits without

17   compensating McDonald for their value.

18   **VII.   PRAYER FOR RELIEF**

19   168.   WHEREFORE, Plaintiff respectfully requests this Court enter a

20   judgement:

21   A) Finding that Defendant Gurson had a valid contract with Plaintiff

22   McDonald for 10% of RoxyCar;

23   B) Ordering Defendant Gurson to pay $1,400,000 to Plaintiff representing

24   10% of the current value of RoxyCar;

25

1        C) Granting monetary relief reflecting the fair value of the lost opportunities

2    from the breached agreement;

3        D) Granting such equitable relief as may be appropriate or necessary to

4    offset the unjust enrichment and detrimental reliance;

5        E) Dismissing the removed state court action against Mr. McDonald in

6    accordance with the agreed upon terms of settlement; and

7        E) Court costs, attorney and filing fees and/or other such relief as the Court

8    may deem necessary and proper.

9

10

11        Dated: May 9, 2017

12

13        Respectfully Submitted,

14

15        _Brett McDonald_

16    Brett McDonald, *pro se*

17

18                     **CERTIFICATE OF SERVICE**

19

20    I hereby certify that on May 9, 2017, I engaged AAA Legal Process Inc. and

21    Brandywine Process Servers, Ltd. to personally serve Bora Gurson and RoxyCar

22    Inc. with this Complaint For Money Damages; Breach of Contract; Promissory

23    Estoppel and Unjust Enrichment as well as all Exhibits.

24                          s/ *Brett McDonald*

25                          Brett McDonald